**IN THE UNITED STATES DISRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **TIMOTHY D. WILLSON**<br><br>          Plaintiff,<br><br>     v.<br><br>**BANK OF AMERICA, N.A.**<br><br>          Defendant.<br>_____/ | CASE NO.  15-CV-14303-MIDDLEBROOKS/LYNCH<br><br>JUDGE |

## <u>AMENDED COMPLAINT FOR DAMAGES</u>
(with Jury Demand)

Now comes Plaintiff Timothy D. Willson, by and through counsel, and hereby states as follows for his Amended *Complaint* against Defendant Bank of America, N.A.:

### <u>PARTIES, JURISDICTION, AND VENUE</u>

1.  Plaintiff Timothy D. Willson ("Plaintiff" or "Willson") is the owner of real property located at and commonly known as 645 Cypress Road, Vero Beach, FL 32963 (the "Property").

2.  Plaintiff currently maintains the Property as his primary, principal residence.

3.  Defendant Bank of America, N.A. ("Defendant", "B of A", or "Servicer") is the current servicer of a note (the "Note") and a mortgage on the Property that allegedly secures the Note (the "Mortgage") (collectively referred to hereinafter as the "Loan").

4.  Defendant QBE First Insurance Agency provided force placed insurance on behalf of Plaintiff's Loan.  This Defendant will be referred to hereafter as "QBE FIRST."

5.  Borrower asserts a claim against QBE FIRST and Servicer for tortious interference with a business relationship under the common law of the State of Florida.  Because

1

there is complete diversity of citizenship and because the amount in controversy, including Borrower's claim for punitive damages, is in excess of $75,000, this Court has diversity jurisdiction pursuant to 28 USC § 1332.

6.   This Court has jurisdiction pursuant to 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq*. (RESPA).

7.   This action is specifically filed to enforce regulations promulgated by the Consumer Finance Protection Bureau (CFPB) that became effective on January 10, 2014, specifically, 12 C.F.R. §§ 1024.35, 1024.36, and 1024.41 of Regulation X.

8.   This Court has supplemental jurisdiction to hear any and all state law claims pursuant to 28 U.S.C. § 1367.

9.   Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as Plaintiff maintains the Property as Plaintiff's primary residence.

## **INTRODUCTION**

10.   Plaintiff restates and incorporates herein all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

11.   In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

12.   Specifically, on January 17, 2013, the CFPB issued the RESPA (Regulation X) and TILA (Regulation Z) Mortgage Servicing Final Rules, 78 F.R. 10901 (February 14, 2013) and 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

13.    The Loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

14.    Defendant is subject to the aforesaid Regulations and does not qualify for the exception for "small servicers", as such term is defined in 12 C.F.R. § 1026.41(e)(4), nor the exemption for a "qualified lender", as such term is defined in 12 C.F.R. § 617.700.

15.    Plaintiff is asserting a claim for relief against Defendant for breaches of the specific rules under Regulation X as set forth below.

16.    Plaintiff has a private right of action under RESPA pursuant to 12 U.S.C. § 2605(f) for the claimed breaches and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

## BACKGROUND

17.    Plaintiff restates and incorporates herein all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

18.    Defendant began servicing the Loan at some point prior to December 1, 2013.

19.    Defendant services the Loan on behalf of non-Party Fannie Mae as Trustee on behalf of Fannie Mae REMIC Trust 2006-W2.

20.    On or about December 2, 2013, Defendant initiated foreclosure proceedings against Plaintiff in the case captioned and/or otherwise stylized as *U.S. Bank, N.A. v. Timothy D. Willson,* et al., in the Circuit Court of the Nineteenth Judicial Circuit in and for Indian River County, Florida, which was assigned Case Number 2013 CA 001615 (the "Foreclosure")

21.    On or about October 16, 2014, the judge in the Foreclosure issued *Final Order Scheduling Trial* and scheduled the trial to occur on December 1, 2014 (the "Trial").

22.    On or about October 28, 2015, Attorney Leo W. Desmond, counsel for Willson in the Foreclosure, and Attorney Karen Green of Marinosci Law Group, PC ("MLG"), counsel for B of A in the Foreclosure, communicated via electronic mail transmission about filing a joint motion to continue the Trial as mediation was to be scheduled for the week after the Trial took place, with Attorney Green agreeing to draft such a motion. A copy of the e-mail thread containing such communication is attached as *Plaintiff's Exhibit A*.

23.    On or about November 4, 2014, Plaintiff, Attorney Desmond, submitted a facially complete loss mitigation application containing all of the information and documentation requested by and through Defendant's standard loss mitigation application (the "Application") as an attachment to an electronic mail correspondence to Attorney Karen Green of Marinosci Law Group, PC ("MLG").  See *Plaintiff's Exhibit A*.

24.    As of November 4, 2014, there was no foreclosure sale scheduled for the Property at any point in time.

25.    As of November 17, 2014, Attorney Desmond had not received a draft of the joint motion to continue the trial from Attorney Green as agreed, nor had Attorney Desmond or Plaintiff received any written communication acknowledging receipt of the Application.

26.    Attorney Desmond wrote to Attorney Green on November 17, 2014, regarding the status of the joint motion to continue the trial; Attorney Green responded that she

would not be able to draft the joint motion, but that she would review any draft that Attorney Desmond would send to her.  See *Plaintiff's Exhibit A*.

27.   On November 20, 2014, Attorney Green indicated that she was still waiting for Defendant's approval of the continuance that was previously agreed to by Attorney Green on October 28, 2014.  See *Plaintiff's Exhibit A*.

28.   As a result of this troubling development, Attorney Desmond sent further correspondence seeking to confirm when Attorney Desmond would be able to confirm if Defendant agreed to or otherwise approved the joint motion to continue, to confirm that Defendant was in possession of the Application, and to confirm that the Application was complete.  See *Plaintiff's Exhibit A*.

29.   The parties to the Foreclosure filed the joint motion to continue the trial, captioned as an "EMERGENCY MOTION TO STRIKE OR IN THE ALTERNATIVE CONTINUE NON-JURY TRIAL SET FOR DECEMBER 1, 2014" (the "Motion") on or about November 20, 2014, eleven (11) days prior to the Trial, and twenty-three (23) days after Attorney Green agreed to draft and file a joint motion to continue the trial.

30.   The judge summarily dismissed the Motion on November 26, 2015, without conducting a hearing.

31.   The Trial occurred as scheduled on December 1, 2014.

32.   At no point prior to the Trial did Defendant ever send any written correspondence acknowledging receipt of the Application.

33.   In an impossibly convenient twist, roughly twenty-seven (27) days after Plaintiff submitted the Application, and just ***hours after the Trial was concluded*** on December 1, 2014, Victoria Kowalczuk of MLG wrote to Attorney Desmond asking

Attorney Desmond to resend the Application claiming that the previous communication contained corrupted information and was sent to "SPAM mail". A copy of the e-mail thread containing said communication is attached as *Plaintiff's Exhibit B*.

34. Ms. Kowalczuk never stated that Plaintiff did not send the Application on November 4, 2014, rather, it appears that MLG just did not open the correspondence containing the Application until after the Trial to review the contents of such.

35. Ms. Kowalczuk offered no explanation as to why MLG did not contact Attorney Desmond earlier despite the fact that he had previously and explicitly requested confirmation of the receipt of the Application in the e-mail correspondence on November 20, 2015, even though he was under no duty to do so, to which Plaintiff did not respond. See *Plaintiff's Exhibit A*.

36. Within minutes, Attorney Desmond resent the Application and requested that Defendant confirm receipt. See *Plaintiff's Exhibit B*.

37. Defendant sent correspondence directly to Plaintiff on or about December 2, 2014, stating that they received the Application and that Defendant would respond to the request for a loan modification after the necessary information is reviewed (the "Acknowledgment"). A copy of the Acknowledgment is attached as *Plaintiff's Exhibit C*.

38. The Acknowledgment did not state whether or not the Application was complete. See *Plaintiff's Exhibit C*.

39. On or about January 12, 2015, the judge issued a *Final Judgment of Foreclosure* in favor of B of A and against Willson.

40.    On or about January 17, 2015, Defendant sent written correspondence to Plaintiff and Attorney Desmond stating that Plaintiff was not eligible for a loan modification under any of the loss mitigation programs available to Plaintiff (the "Denial").  A copy of the Denial is attached as *Plaintiff's Exhibit D*.

41.    The Denial stated that Plaintiff had thirty (30) calendar days from the date of the Denial to appeal the decision by sending a notice of and reasoning for the basis of such appeal via facsimile transmission to Defendant. See *Plaintiff's Exhibit D*.

42.    On or about February 9, 2015, Plaintiff sent correspondence to Defendant captioned "Notice of Error" via United States Postal Service (USPS) Priority Mail Express [Tracking No. EK 734723435 US] ("NOE #1).  A copy of NOE #1 along with the shipping receipt for such is attached as *Plaintiff's Exhibit E.*

43.    Defendant received NOE #1 on February 11, 2015.  See *Plaintiff's Exhibit E*; also, a printout of the tracking information for NOE #1 from USPS's website ([www.usps.com](www.usps.com)), accessed on July 20, 2015, is attached s *Plaintiff's Exhibit F*.

44.    Defendant sent written correspondence to Plaintiff, by and through authorized third-party advocate, Da'vid Abellard, Jr.,  dated February 18, 2015, acknowledging receipt of NOE #1 ("Acknowledgment of NOE #1").  A copy of Acknowledgment #1 is attached as *Plaintiff's Exhibit G*.

45.    By and through NOE # 1, Plaintiff alleged that Defendant committed two (2) clear, distinct, and separate errors in the servicing of the Loan.  See *Plaintiff's Exhibit E*.

46.    By and through NOE # 1, Plaintiff alleged that Defendant committed a clear, distinct, and separate error in the servicing of the Loan by failing to send the written notice required by 12 C.F.R. § 1024.41(b)(2)(i)(B) acknowledging receipt of the Application

submitted on November 4, 2014, within five (5) days, excluding legal public holidays, Saturdays, and Sundays.

47.   By and through NOE # 1, Plaintiff alleged that Defendant committed a clear, distinct, and separate error in the servicing of the Loan by moving forward with the Trial, an action which would, and did, cause or directly resulted in the issuance of a foreclosure judgment.

48.   On or about February 15, 2015, Plaintiff, by and through authorized third-party advocate, Da'vid Abellard, Jr., sent correspondence to Defendant, via facsimile transmission, captioned "REQUEST FOR RE-EVALUATION AND INDEPENDENT REVIEW" (the "Appeal") seeking an appeal and independent review of the Application.  A copy of the Appeal is attached as *Plaintiff's Exhibit H;* a copy of the facsimile transmission result for the Appeal is attached as *Plaintiff's Exhibit I*.

49.   On or about February 16, 2015, Plaintiff sent correspondence to Plaintiff, captioned "Notice of Error" to Defendant via Certified U.S. Mail [Return Receipt No. 7014 2120 0004 2320 7382] ("NOE #2").  A copy of NOE #2 along with the shipping receipt for such is attached as *Plaintiff's Exhibit J.*

50.   Defendant received NOE #2 on February 20, 2015.  See *Plaintiff's Exhibit J*; also, a printout of the tracking information for NOE #2 from USPS's website (www.usps.com), accessed on July 20, 2015, is attached s *Plaintiff's Exhibit K*.

51.    On or about February 20, 2015, Defendant sent correspondence to Plaintiff, by and through authorized third-party advocate Da'vid Abellard, Jr., acknowledging receipt of the Appeal and confirming that Defendant received the Appeal on February 16,

2015 (the "First Acknowledgment of Appeal").  A copy of the First Acknowledgment of Appeal is attached as *Plaintiff's Exhibit L*.

52.  Confusingly, despite already confirming receipt of on or about February 23, 2015, Defendant sent written correspondence to Plaintiff confirming receipt of the Appeal once again (the "Second Acknowledgment of Appeal"), yet this time, conveniently claiming that Defendant received the Appeal on February 20, 2015, (2) days past the deadline by which Plaintiff had to submit the Appeal.   A copy of the Second Acknowledgment of Appeal is attached as *Plaintiff's Exhibit M*.

53.  Subsequently, on February 25, 2015, Defendant sent correspondence to Plaintiff stating that the Appeal was denied because "it did not satisfy the requirements for an escalation set forth in [the Denial]" (the "Appeal Denial").  A copy of the Appeal Denial is attached as *Plaintiff's Exhibit N*.

54.  Coincidentally, the example provided for why the Appeal may not have complied with the requirements established in the Denial was that "it may have been received after the deadline for an escalation".  See *Plaintiff's Exhibit N*.

55.  That is, due to the "revised" receipt date proffered by Defendant in the Second Acknowledgment of Appeal, Defendant determined that they received the Letter four (4) days beyond purported deadline of contained in the Denial of February 16, 2015. See *Plaintiff's Exhibits L, M,* and *N*, respectively.

56.  Defendant did not perform any independent review of the Application because they declined the Appeal on a procedural technicality.

57.  Also, on or about February 25, 2015, Defendant sent correspondence to Plaintiff, by and through authorized third-party advocate Da'vid Abellard Jr, acknowledging

receipt of NOE #2 and confirming that Defendant received NOE #2 on February 20, 2015 (the "Acknowledgment of NOE #2").  A copy of the Acknowledgment of NOE #2 is attached as *Plaintiff's Exhibit O*.

58.   NOE #2 provided alleged that the Denial was inappropriate.  See *Plaintiff's Exhibit O*.

59.   The Denial provided that "[Defendant] services your loan on behalf of an investor or group of investors that has not given us the contractual authority to modify your loan under the Home Affordable Modification Program. The name of your investor is Fannie Mae as Trustee On Behalf of Fannie Mae REMIC Trust 2005-W2." See *Plaintiff's Exhibits D* and *O*, respectively.

60.   NOE #2 provided that such "reason for denial is used regularly in the industry for investors not participating in Home Affordable Modification programs.  Fannie Mae is a participant in the Home Affordable Modification Program, hence there must be a more specific reason why on a Fannie Mae as Trustee loan on a Fannie Mae created REMIC, why borrower will not be considered.  Please provide specific reason."  See *Plaintiff's Exhibit O*.

61.   Based upon the request for the specific reason the investor had for denying Plaintiff for any and all loss mitigation options, it is clear that such a specific investor requirement was not required and that NOE #2 was alleging an error pursuant to a violation of 12 C.F.R. § 1024.41(d) as Comment 1 to 12 C.F.R. § 1024.41(d) provides that:

> If a trial or permanent loan modification option is denied because of a requirement of an owner or assignee of a mortgage loan, the specific reasons in the notice provided to the borrower must identify the owner or assignee of the mortgage loan and the requirement that is the basis of the denial. A statement that the denial of a

> loan modification option is based on an investor requirement, without additional information specifically identifying the relevant investor or guarantor and the specific applicable requirement, is insufficient.

62. On March 18, 2015, Defendant, by and through Louise Bowes of Blank Rome LLP, sent correspondence to Plaintiff, by and through authorized third-party Da'vid Abellard Jr., purporting to respond to NOE #1, the Appeal, and NOE #2 (the "BR Response"). A copy of the BR response is attached as *Plaintiff's Exhibit P.*

63. Oddly, the BR Response conclusively remarked that Defendant "is unable to ascertain any specific error alleged by [Plaintiff]" despite the fact that the Borrower alleged no less than three (3) errors and despite the fact that the BR Response contained direct, although insufficient, responses to the errors alleged in NOE #1. See *Plaintiff's Exhibit P.*

64. Beyond Plaintiff's broad, incorrect, and conclusory statements, the BR Response essentially consisted of a basic explanation and reiteration of Defendant's records with no apparent research into the actual errors alleged in NOE #1 and NOE #2. See *Plaintiff's Exhibit P.*

65. In regards to NOE #1, the BR Response merely stated that no error was committed because Defendant's records show that the Application "was received in December 2014, and the [Acknowledgment of Application] was sent"; there is no mention whatsoever of research into Plaintiff having sent the Application on November 4, 2014. See *Plaintiff's Exhibit P.*

66. Defendant's research into the errors alleged by and through NOE #1 was not reasonable as Defendant would have noted that Plaintiff submitted the Application on November 4, 2014, had they performed the very reasonable and basic action of

*contacting their own counsel in the Foreclosure* to inquire as to this matter since there is a very distinct and clear chain of correspondence establishing the same.

67. The BR Response did not contain any substantive response to NOE #2.

68. The BR Response conclusively stated that "[i]t is [Defendant's] position that no further response to the Letter is required.

69. At the time of the filing of this Complaint, Defendant has had more than 22,300 consumer complaints lodged against them nationally, specifically concerning the issue identified as "loan modification, collection, foreclosure." Each such complaint is filed and cataloged in the Consumer Financial Protection Bureau's publicly accessible online database. (http://www.consumerfinance.gov/complaintdatabase/).

70. At all points in time, Plaintiff has merely wanted to exercise his right to be properly reviewed for loss mitigation options by Defendant so that Plaintiff could get out of default status on the Loan, resume making proper, timely payments on the Loan to Defendant, and begin to rehabilitate his credit.

71. Defendant, however, has engaged in a pattern and practice of behavior that sought to hinder Plaintiff from obtaining a loan modification and force Plaintiff to incur unnecessary expenses.

72. Defendant's willful actions in their handling of the Foreclosure and the related loss mitigation process have caused Plaintiff to incur further legal expenses and damages in the Foreclosure by having to continue to incur legal expenses in the preparation for and mounting of a defense at the Trial, and in the preparation of requests for information and notices of error as outlined, *infra.*

73.     Had Defendant handled Plaintiff's loss mitigation application properly, then the Trial would have been continued and Defendant would not have had to mount a defense at such and endure the emotional stress of the Trial.

74.     Further, Defendant's pattern and practice of willful actions have caused Plaintiff to suffer emotional distress driven by the fear that he might lose and be forced to leave his and his wife's family home which has resulted in anxiety, depression, embarrassment, and other emotional distress, as well as a great deal of strain and damage to his relationship with his wife.

75.     Plaintiff's fear of losing his family home was directly exacerbated by the willful and improper actions of Defendant because Defendant's actions prevented Plaintiff from exercising all of options to which Plaintiff is entitled to save his home.

76.     Defendant's actions have caused an unnecessary delay in the review of Plaintiff's loss mitigation application forcing him to unnecessarily remain in default status for a longer period of time than if Defendant would have complied with Regulation X, which has caused unnecessary continued harm to Plaintiff's credit.

77.     Further, the actions of Defendant, and their continued refusal to correct their errors by being willfully ignorant and/or feigning ignorance, have left Defendant with no other recourse to attempt to remain in his home than to declare for relief under the United States Bankruptcy code which has caused him to incur further legal expenses and suffer further other damages including continued harm to his credit for the foreseeable future.

78.   Had Defendant properly handled Plaintiff's loss mitigation application pursuant to Regulation X, Plaintiff would have been able to properly exercise his rights in seeking loss mitigation options and would not have had to file for bankruptcy protection.

## COUNT ONE: VIOLATION OF 12 C.F.R. § 1024.41(b)(2)

**(Failure to Provide Written Notification of Receipt of Loss Mitigation Application and Notification of Servicer's Determination as to Completeness of Loss Mitigation Application)**

79.   Plaintiff restates and incorporates herein all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

80.   12 C.F.R. §1024.41(b)(2) provides that if a servicer receives a loss mitigation application forty-five (45) days or more before a foreclosure sale that the servicer must promptly review the application to determine whether the application is complete and notify the borrower in writing within five (5) days, excluding public holidays, Saturdays, and Sundays, whether the application is complete.

81.   12 C.F.R. §1024.41(b)(2) further provides that if the servicer determines that the application is incomplete, then the written notice to the borrower must provide which additional documents are required to complete the loss mitigation application and a reasonable date by which the borrower must submit such documents.

82.   Defendant was represented by MLG in the Foreclosure, as such, receipt of any documents on by MLG on behalf of Defendant constitutes receipt of such documents by Defendant.

83.   Attorney Desmond sent the Application to Defendant, by and through MLG, on November 4, 2014.  See *Plaintiff's Exhibit A*.

84.   Defendant was in receipt of or otherwise deemed to be in receipt of the Application as of November 4, 2014, See *Plaintiff's Exhibit A*.

85.   Ms. Kowalczuk claimed twenty-seven (27) days after MLG's receipt of the Application that the Application was sent to MLG's "SPAM mail", but at no point does Ms. Kowalczuk or anyone else at MLG claim that the Application was not sent to MLG on November 4, 2014.  See *Plaintiff's Exhibit B*.

86.   Defendant was required, pursuant to 12 C.F.R. § 1024.41(b)(2) to review the Application and provide written notice to Plaintiff on or before November 12, 2014, stating that the packet is either complete or that the packet is incomplete.

87.   If Defendant determined that the Application was incomplete, the written notice to Plaintiffs, as required by 12 C.F.R. §1024.41(b)(2), needed to provide which additional documents were required to complete the Application and a reasonable date by which Plaintiff would be required to submit the additional documents.

88.   Defendant did not provide any written notice as to whether the Application was complete on or before November 12, 2014.

89.   Defendant's failure to provide the written notice required by 12 C.F.R. §1024.41(b)(2) on or before November 12, 2014, constitutes a willful violation of 12 C.F.R. §1024.41(b)(2).

90.   Defendant's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiff's rights.

91.   As a result of Defendant's actions, Defendant is liable to Plaintiffs for actual damages, statutory damages, costs, and attorneys' fees.

## COUNT TWO: VIOLATIONS OF 12 C.F.R. § 1024.41(g)

**(Violation of Prohibition on Moving in Support of Foreclosure Judgment with Loss Mitigation Application Pending)**

92.     Plaintiff restates and incorporates herein all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

93.     12 C.F.R. § 1024.41(g) states that if a borrower submits a complete loss mitigation application after the first filing required for any judicial foreclosure process, but more than thirty-seven (37) days before a foreclosure sale, then a servicer cannot move for foreclosure judgment or order of sale unless: (1) the servicer has sent written notice pursuant to 12 C.F.R. § 1024.41(c)(1)(ii), stating that the borrower is not eligible for any loss mitigation options and the borrower has not requested an appeal, or the borrower's appeal has been denied; (2) the borrower rejects all loss mitigation options offered by the servicer; or, (3) the borrower fails to perform under an agreement on a loss mitigation option.

94.     Comment 2 of the Official CFPB Interpretations to 12 C.F.R. § 1024.41(g) provides that:

> Nothing in § 1024.41(g) prevents a servicer from proceeding with the foreclosure process, including any publication, arbitration, or mediation requirements established by applicable law, when the first notice or filing for a foreclosure proceeding occurred before a servicer receives a complete loss mitigation application so long as any such steps in the foreclosure process do not cause or directly result in the issuance of a foreclosure judgment or order of sale, or the conduct of a foreclosure sale, in violation of § 1024.41.

95.     12 C.F.R. § 1024.41(c)(2)(iv) provides that "[i]f a borrower submits all the missing documents and information as stated in the notice required pursuant to

§ 1026.41(b)(2)(i)(B), or *no additional information is requested in such notice, the application shall be considered facially complete*" (emphasis added).

96. Comment 1 of the Official CFPB Interpretations to 12 C.F.R. § 1024.41(c)(2)(iv) provides that 12 C.F.R. § 1024.41(c)(2)(iv) "requires a servicer to treat a facially complete application as complete for the purposes of paragraphs (f)(2) and (g) until the borrower has been given a reasonable opportunity to complete the application."

97. Defendant was represented by MLG in the Foreclosure, as such, receipt of any documents on by MLG on behalf of Defendant constitutes receipt of such documents by Defendant.

98. Comment 1 of the official CFPB interpretations of 12 C.F.R. § 1024.41(b)(3) that "[i]f no foreclosure sale has been scheduled as of the date that a complete loss mitigation application is received, the application is considered to have been received more than 90 days before any foreclosure sale."

99. Attorney Desmond sent the Application to Defendant, by and through MLG, on November 4, 2014.  See *Plaintiff's Exhibit A.*

100. Defendant was in receipt of or otherwise deemed to be in receipt of the Application as of November 4, 2014, See *Plaintiff's Exhibit A.*

101. Defendant's did not provide the written notice required by 12 C.F.R. §1024.41(b)(2) at any time prior to the Trial.

102. Defendant was in receipt of or otherwise deemed to be in possession of a facially complete loss mitigation application as of November 4, 2014.

103. As of November 4, 2014, there was no foreclosure sale scheduled for the Property at any point in time.

104. The Trial was conducted as scheduled on December 1, 2014.

105. As of the commencement of the Trial, Defendant had not sent written notice pursuant to 12 C.F.R. § 1024.41(c)(1)(ii), stating that Plaintiff was not eligible for any loss mitigation options

106. As of the commencement of the Trial, Defendant had not sent any written notice notifying Plaintiff that Plaintiff was approved for any loss mitigation options so Plaintiff could not have rejected all loss mitigation options offered by Defendant, nor could Plaintiff fail to perform under an agreement on a loss mitigation option.

107. Despite receiving correspondence putting Attorney Green on notice of the fact that Plaintiff had submitted the Application and seeking confirmation of such, Attorney Green and Defendant willfully chose to be ignorant of such and "stick their heads in the sand" so that they could proceed forward with the trial and later claim *after the trial* that there was an issue with the submission of the Application.  See *Plaintiff's Exhibit A* and *Exhibit B*, respectively.

108. Further evidence shows that the actions of Attorney Green and Defendant constituted willful ignorance because, oddly, despite Ms. Kowalczuk's claims that the Application went to MLG's "SPAM mail", the numerous other e-mails from Attorney Desmond to Ms. Green were received in normal course and were even responded to in a relatively timely matter. See *Plaintiff's Exhibit A* and *Exhibit B*, respectively.

109. Conducting the Trial directly resulted in the issuance of a foreclosure judgment on or about January 12, 2015.

110. Plaintiff's actions in moving forward with conducting and introducing evidence at the Trial prior to completing a review of Plaintiff's eligibility for any and all loss

mitigation options pursuant to the Application as required by 12 C.F.R. §1024.41 constitute a clear, separate, and distinct violation of 12 C.F.R. § 1024.41(g).

111. Defendant's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiff's rights.

112. As a result of Defendant's actions, Defendant is liable to Plaintiffs for actual damages, statutory damages, costs, and attorneys' fees.

113. The actions of Defendant and their counsel exemplify a concerted effort and the use of tactics to willfully circumvent Defendant's obligations pursuant to 12 C.F.R. § 1024.41(g) such that punitive damages should be awarded.

### COUNT THREE: VIOLATIONS OF 12 C.F.R. § 1024.41(h)

### (Failure to Perform Appeal of Denial of Loss Mitigation Options)

114. Plaintiff restates and incorporates herein all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

115. 12 C.F.R. § 1024.41(h)(1) provides that "[i]f a servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph (f) of this section, a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower."

116. 12 C.F.R. § 1024.41(h)(3) provides that "[a]n appeal shall be reviewed by different personnel than those responsible for evaluating the borrower's complete loss mitigation application."

117. Defendant submitted a complete loss mitigation application ninety(90) days or more prior to any foreclosure sale of the Property.

118. The Denial was sent on January 17, 2015.  See *Plaintiff's Exhibit D*.

119. The Denial stated that Plaintiff had thirty(30) calendar days from the date of the Denial to appeal the Denial by sending a notice of and reasoning for the basis of such appeal via facsimile transmission to Defendant. See *Plaintiff's Exhibit D*.

120. As such, Plaintiff had to submit an appeal of the Denial on or before February 16, 2015.

121. Plaintiff sent the Appeal to Defendant via facsimile transmission on Sunday, February 15, 2015.  See *Plaintiff's Exhibits H* and *I*, respectively.

122. As such, Defendant was in receipt of or otherwise deemed to be in receipt of the Appeal on Monday, February 16, 2015.

123. On or about February 20, 2015, Defendant sent the First Acknowledgment of Appeal which stated that Defendant was "in receipt of [Plaintiff's] correspondence dated February 9, 2015, and February 15, 2015, which were received on February 13, 2015, and February 16, 2015, respectively by [Defendant]".  See *Plaintiff's Exhibit J*.

124. The Appeal was the only correspondence which Plaintiff sent to Defendant that was dated February 15, 2015, so there is no doubt that the correspondence which Defendant claimed to have received on February 16, 2015 was anything other than the Appeal.  See *Plaintiff's Exhibit H* and *Exhibit J*, respectively.

125. As such, Plaintiff submitted the Appeal, and Defendant received the Appeal, on or before the deadline of February 16, 2015, as established in the Denial.  See *Plaintiff's Exhibits D*, *H*, and *Exhibit J*, respectively.

126. Rather than perform an independent review of Plaintiff's complete application, however, Defendant once again knowingly chose to act in a manner strictly designed

to improperly circumvent their obligations under 12 C.F.R. § 1024.41 by subsequently claiming in the Second Acknowledgment of Appeal that Defendant received the Appeal on February 20, 2015, rather than the previously claimed date of February 16, 2015, which is conveniently beyond the deadline for an appeal pursuant to the Denial. See *Plaintiff's Exhibit M*.

127.   Further evidencing that Defendant's actions are willfully designed to circumvent their obligations pursuant to 12 C.F.R. § 1024.41, if one were to take Defendant's claims in the Second Acknowledgment of Appeal as truthful, then that would mean that it somehow took over four (4) days for Defendant to receive a short facsimile transmission that was confirmed to have been sent on February 15, 2015.  See *Plaintiff's Exhibits I* and *M*, respectively.

128.   Subsequently, Defendant denied the Appeal by and through the Appeal Denial because "it did not satisfy the requirements for an escalation set forth in [the Denial]" as the Appeal was improperly claimed to have been received on February 20, 2015. *Plaintiff's Exhibits H*, *I*, *J*, and *M*.

129.   Defendant did not perform any independent review of the Application because they declined the Appeal on a procedural technicality that had no legitimate factual basis.

130.   Plaintiff's actions in failing to properly conduct an independent review of Plaintiff's complete loss mitigation application as required by 12 C.F.R. §1024.41 constitute a clear, separate, and distinct violation of 12 C.F.R. § 1024.41(h).

131.   Defendant's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiff's rights.

132. As a result of Defendant's actions, Defendant is liable to Plaintiffs for actual damages, statutory damages, costs, and attorneys' fees.

133. The actions of Defendant exemplify a concerted effort and the use of tactics to willfully circumvent Defendant's obligations pursuant to 12 C.F.R. § 1024.41(h) such that punitive damages should be awarded.

### COUNTS FOUR AND FIVE: VIOLATIONS OF 12 C.F.R. § 1024.35(e)

### (Failure to Properly Respond to Errors Noticed Pursuant to 12 C.F.R. § 1024.35(b)(10))

134. Plaintiff restates and incorporates herein all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

135. 12 C.F.R. 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or:

> Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

136. 12 C.F.R. 1024.35(e)(3)(i)(C) provides that, in regards for a Notice of Error submitted in response to  a servicer must comply with 12 C.F.R. 1024.35(e)(1) no later than thirty (30) days, excluding legal public holidays, Saturdays, and Sundays, after the servicer's receipt of the applicable notice of error.

137.    Comment 1 of the Official CFPB Interpretations to 12 C.F.R. § 1024.35(e)(4) indicates that a notice of error alleging multiple errors may be treated as separate notices of error.

138.    By and through NOE # 1, Plaintiff alleged that Defendant committed two (2) clear, distinct, and separate errors in the servicing of the Loan.  See *Plaintiff's Exhibit E*.

139.    By and through NOE # 1, Plaintiff alleged that Defendant committed a clear, distinct, and separate error in the servicing of the Loan, pursuant to 12 C.F.R. § 1024.35(b)(11), by failing to send the written notice required by 12 C.F.R. § 1024.41(b)(2)(i)(B) acknowledging receipt of the Application submitted on November 4, 2014, within five (5) days, excluding legal public holidays, Saturdays, and Sundays. See *Plaintiff's Exhibit E*.

140.    By and through NOE # 1, Plaintiff alleged that Defendant committed a clear, distinct, and separate error in the servicing of the Loan, pursuant to 12 C.F.R. § 1024.35(b)(10), by moving forward with the Trial, an action which would, and did, cause or directly resulted in the issuance of a foreclosure judgment in violation of 12 C.F.R. § 1024.41(g).  See *Plaintiff's Exhibit E*.

141.    Both the errors alleged in NOE #1 stem from the fact that Defendant acted in willful ignorance of the submission of the Application on November 4, 2014, so that Defendant would not have to comply with the requirements of 12 C.F.R. § 1024.41.

142.    That is, the errors alleged in NOE #1 stemmed from Plaintiff's claim that the Application was originally submitted on November 4, 2014, not December 2014.

143.    Defendant did not correct the two (2) clear, distinct, and separate errors alleged in NOE #1. See *Plaintiff's Exhibit P*.

144. In regards to NOE #1, the BR Response merely stated that no error was committed because Defendant's records show that the Application "was received in December 2014, and the [Acknowledgment of Application] was sent"; there is no mention whatsoever of research into Plaintiff having sent the Application on November 4, 2014.  See *Plaintiff's Exhibit P.*

145. Defendant's research into the errors alleged by and through NOE #1 was not reasonable as Defendant would have noted that Plaintiff submitted the Application on November 4, 2014, had they performed the very reasonable and basic action of *contacting their own counsel in the Foreclosure* to inquire as to this matter since there is a very distinct and clear chain of correspondence establishing the same.

146. Had Defendant contacted their own foreclosure counsel, they would have clearly ascertained that Plaintiff *did* submit the Application on November 4, 2014, but that MLG just did not properly monitor their own electronic mail system so as to forward such to Defendant directly or to open the November 4, 2014, e-mail and review the contents therein.

147. Defendant's actions, in failing to correct the two (2) clear, separate, and distinct errors Plaintiff alleged in NOE #1, or in failing to conduct a reasonable investigation into such errors in their determination that no such errors occurred, constitute two (2) clear, separate, distinct, and willful violations of 12 C.F.R. § 1024.35(e).

148. Defendant's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiff's rights.

149. As a result of Defendant's actions, Defendant is liable to Plaintiff for actual damages, statutory damages, costs, and attorneys' fees.

## COUNT SIX: VIOLATIONS OF 12 C.F.R. § 1024.35(e)

## (Failure to Properly Respond to Errors Noticed Pursuant to 12 C.F.R. § 1024.35(b)(10))

150.    Plaintiff restates and incorporates herein all of their statements and allegations
contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

151.    12 C.F.R. 1024.35(e)(1) provides that a servicer must respond to a notice of error by
either "[c]orrecting the error or errors identified by the borrower and providing the
borrower with a written notification of the correction, the effective date of the
correction, and contact information, including a telephone number, for further
assistance" or:

> Conducting a reasonable investigation and providing the
> borrower with a written notification that includes a
> statement that the servicer has determined that no error
> occurred, a statement of the reason or reasons for this
> determination, a statement of the borrower's right to
> request documents relied upon by the servicer in
> reaching its determination, information regarding how
> the borrower can request such documents, and contact
> information, including a telephone number, for further
> assistance.

152.    12 C.F.R. 1024.35(e)(3)(i)(C) provides that, in regards for a Notice of Error submitted
in response to  a servicer must comply with 12 C.F.R. 1024.35(e)(1) no later than
thirty (30) days, excluding legal public holidays, Saturdays, and Sundays, after the
servicer's receipt of the applicable notice of error.

153.    NOE #2 provided alleged that the Denial was inappropriate.  See *Plaintiff's Exhibit O*.

154.    The Denial provided that "[Defendant] services your loan on behalf of an investor or
group of investors that has not given us the contractual authority to modify your loan
under the Home Affordable Modification Program. The name of your investor is

Fannie Mae as Trustee On Behalf of Fannie Mae REMIC Trust 2005-W2." See *Plaintiff's Exhibits D* and *O*, respectively.

155.   NOE #2 provided that such "reason for denial is used regularly in the industry for investors not participating in Home Affordable Modification programs.  Fannie Mae is a participant in the Home Affordable Modification Program, hence there must be a more specific reason why on a Fannie Mae as Trustee loan on a Fannie Mae created REMIC, why borrower will not be considered.  Please provide specific reason."  See *Plaintiff's Exhibit O*.

156.   Based upon the request for the specific reason the investor had for denying Plaintiff for any and all loss mitigation options, it is clear that such a specific investor requirement was not provided and that NOE #2 was alleging an error pursuant to a violation of 12 C.F.R. § 1024.41(d) as Comment 1 to 12 C.F.R. § 1024.41(d) provides that:

>        If a trial or permanent loan modification option is denied because of a requirement of an owner or assignee of a mortgage loan, the specific reasons in the notice provided to the borrower must identify the owner or assignee of the mortgage loan and the requirement that is the basis of the denial. A statement that the denial of a loan modification option is based on an investor requirement, without additional information specifically identifying the relevant investor or guarantor and the specific applicable requirement, is insufficient.

157.   The BR Response did not contain any substantive response to NOE #2. See *Plaintiff's Exhibit P*.

158.   The BR Response states at one point that Defendant is "unable to ascertain any specific error alleged by [Plaintiff]" which could be intended to be a response to NOE

#2 by claiming that Defendant is not obligated to respond pursuant to 12 C.F.R. § 1024.35(g), but this would be inappropriate, regardless, because it is clear that the central, focal issue throughout the entirety of NOE #2 is the fact that Defendant failed to provide the appropriate investor guideline details pursuant to 12 C.F.R. § 1024.41(d). See *Plaintiff's Exhibits O* and *P*, respectively.

159. Once again, Defendant is feigning ignorance in an attempt to circumvent their legal obligations in regards to the Borrower's loan.

160. Defendant's actions, in failing to correct the clear, separate, and distinct error Plaintiff alleged in NOE #2, or in failing to conduct a reasonable investigation into such error in their determination that no such error occurred, constitute a clear, separate, distinct, and willful violation of 12 C.F.R. § 1024.35(e).

161. Defendant's actions are believed to be a pattern and practice of behavior in conscious disregard for Plaintiff's rights.

162. As a result of Defendant's actions, Defendant is liable to Plaintiff for actual damages, statutory damages, costs, and attorneys' fees.

## COUNT SEVEN: TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP (AGAINST QBE FIRST)

163. Plaintiff restates and incorporates herein all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

164. Although mortgage servicers receive mortgage payments, regularly correspond with borrowers, send monthly invoice, receive monthly payments, and generally appear to be the mortgagee or "lender", that appearance is not reality. There is no contract or debtor/creditor relationship between Plaintiff and Bank of America. In fact,

Borrower's mortgage loan belongs to the Fannie Mae as Trustee On Behalf of Fannie Mae REMIC Trust 2005-W2, and referred to hereafter as "Fannie Mae."

165.    Servicer has entered into a separate arrangement with Defendant QBE FIRST, and all relevant predecessors, (hereinafter referred to as "QBE FIRST") whereby QBE FIRST monitors the loans within Servicer's servicing portfolio in order to determine whether the borrowers maintain insurance coverage that complies with the borrower's obligations under the mortgage contract. When QBE FIRST determines that appropriate coverage is not in place, it obtains substitute force-placed insurance through a QBE affiliated insurer. QBE FIRST is also involved in administering the escrow accounts for the loans that Servicer services, and that necessarily includes arranging for the payments for the renewal of borrowers insurance policies.

166.    However, the arrangement between Servicer and QBE FIRST presents a conflict of interest because force-placed insurance is extremely lucrative. QBE FIRST therefore has a business incentive to force-place insurance whenever possible. Furthermore, QBE FIRST has agreed to undertake the tracking and escrow services that it performs for Servicer for less than the cost of delivering those services making the tracking services a cost of doing business necessary to secure lucrative force-placed insurance policies.

167.    By outsourcing its insurance tracking services to QBE FIRST, Servicer reduces the costs associated with it, its servicing activities and thereby increases its profits. Servicing and QBE FIRST also effectively transfers the cost of a significant portion of its servicing operations to the borrowers who are charged with force-placed insurance, even though the mortgagee that hires Servicer to service its loans pays a

servicing fee intended to compensate servicer for all servicing related services - including those related to force-placed insurance.

168. Beginning on March 26, 2009[1], Servicer began assessing Borrower charges for force-placed hazard insurance and force-placed flood insurance.  See *Plaintiff's Exhibit Q*.

169. QBE FIRST's justification for the purchase of force-placed insurance in the attached letter however is a pretext. In fact, QBE FIRST and Servicer were in possession of Plaintiff's voluntary insurance policy and could have easily arranged for it to be renewed. QBE FIRST chose not to do that simple because force-placing the coverage was more lucrative for QBE FIRST and its affiliates.

170. The QBE insurance products that QBE FIRST procured were far more expensive than voluntary coverage available in the market. The various hazard policies applied to Borrower's loan cost 3-5 times the amount of comparable insurance available in the voluntary market, and there was no legitimate underwriting reason for the additional expense.

171. In fact, a hazard insurer's profits are measured by loss ratios – the amount of money spent on claims as compared to the amount of money collected in premiums. At all material times QBE FIRST's affiliates' loss ratios are far lower than the loss ratios for any voluntary insurer in the State of Florida.

172. QBE FIRST obtained surplus lines flood insurance coverage even though it could have obtained flood insurance through a Florida admitted carrier participating in the National Flood Insurance Program (NFIP). NFIP flood insurance is subsidized by the

---

[1] Plaintiff reserves the right to amend the date force placed insurance was first placed on the subject loan; although Plaintiff requested the insurance policies, Defendant provided dates of coverage instead. Plaintiff's statement is made in reliance on Defendant's response to the QWR being truthful and complete.

federal government and backed by the full faith and credit of the United States. NFIP flood insurance was readily available and would have cost less than one-fifth the amount of the force-place flood insurance coverage that QBE obtained.

173. FNMA specifically requires its servicers to advance funds necessary to maintain a borrower's coverage in force in order to avoid the additional costs association with force-placed insurance. See *Plaintiff's Exhibit R,* Servicing Guide Announcement SVC 2012-04. Servicer treated the amount of this force-placed flood insurance premium as additional debt owed on the mortgage. Borrower made a significant number of payments during the relevant period of time. Much of the amount that Borrower paid was applied to inflated force-placed insurance charges.

174. QBE FIRST had knowledge of the relationship between Borrower and FNMA as did Servicer. QBE FIRST and Servicer are not a third-party beneficiary to any contracts between Borrower and FNMA.

175. Cognizant of the "high volume low margin" nature of mortgage loan servicing described by the Consumer Financial Protection Bureau and referenced in Paragraph 8 above, QBE FIRST and Servicer exploited the conflict of interest between Servicer and FNMA by entering into a quid pro quo arrangement whereby QBE FIRST agreed to perform loan tracking, escrow management, and other servicing functions on Servicers behalf and for a fee that was less than the cost of providing the servicing related services. This reduced Servicer's operating expenses, but did not decrease the amount it charged FNMA for servicing Borrower's loan. In exchange, QBE FIRST was rewarded with the exclusive right to provide lucrative force-placed insurance on the loans with Servicer's portfolio. QBE FIRST selected its affiliates for Borrower's force-

placed flood insurance and was rewarded with a "commission" equal to half the entire premium. As noted above, this premium was many multiples of the cost insurance readily available through arms-length transactions. Even if the QBE FIRST arguably is not a stranger to the business relationship between Borrower and FNMA, its interference involving the force-placed insurance transactions on Borrower's property was not justified or privileged because the QBE FIRST was operating in contravention of FNMA's express instructions and was acting in bad faith.

176. Furthermore, QBE FIRST and Servicer's actions relating to the force-placed flood insurance policy on Borrower's home were contrary to the interests of FNMA.

177. In addition QBE FIRST and Servicer's conduct substantially increased the amount of Borrower's monthly payment.

178. By effectively bribing Servicer in order to secure the right to provide unreasonably expensive force-placed insurance flood insurance on Borrowers' property, QBE FIRST and Servicer by accepting the bribe intentionally and unjustifiably interfered with the business relationship between Borrower and FNMA by improperly inflating the amount of money that Borrower owed on her mortgage loan and dramatically increasing the risk that their mortgage loan would go into default thereby damaging both Borrower and FNMA.

179. Through his relationship with FNMA, Borrower had the right to use the mortgage funds provided to purchase her home, and to repay the borrowed funds at an agreed upon interest rate and subject to the various terms and conditions of the mortgage. As a result of the QBE Defendants' and Servicer's interference in that relationship, Borrower's rights were violated because her indebtedness was enhanced by

exploitative, extortionate, and unreasonable force-placed insurance premiums that were contrary to both Borrower's and FNMA's reasonable commercial expectations and imposed solely to produce an unreasonable profit for the QBE Defendants.

180.  As a result of QBE Defendants' and Servicer's tortious interference in his business relationship with the mortgagee/investor, Borrower has been damaged. These damages include additional debt arising from the inflated force-placed flood insurance premiums that has been added to Borrower's mortgage, and may even have caused a wrongful foreclosure which could ultimately result in the loss of her home.

181.  The QBE Defendants' and Servicer's tortious interference with Borrower's relationship with FNMA was intentional and the QBE Defendants and Servicer had actual knowledge of the wrongfulness of their conduct.

182.  The QBE Defendants' and Servicer's tortious interference in the relationship between Borrower and FNMA was motivated solely by an effort to obtain unreasonable financial gain.

183.  The QBE Defendants and Servicer had actual knowledge that their tortious interference in the relationship between Borrower and FNA would harm Borrower.

184.  The QBE Defendants' and Servicer have earned substantial profits from their tortious interference with Borrowers' relationship with FNMA through similar misconduct affecting a large number of similarly situated borrowers and investors. In order to deter similar misconduct in the future, an award of punitive damages is appropriate.

185.  WHEREFORE, Borrower demands trial by jury and respectfully requests that this Honorable Court enter judgment her favor in the entire amount of her damages,

including punitive damages, against each of the QBE Defendant jointly and severally together with an award of the costs of this action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter its order granting judgment for the following:

A.)   For actual damages, costs, and reasonable attorney fees;

B.)   For statutory damages in the amount of Two Thousand Dollars ($2,000.00) as to each and every count contained in Count One through Count Six;

C.)   For punitive damages to the extent that this Court may deem appropriate;

D.)   Such other relief which this Court may deem appropriate.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues, with the maximum number of jurors permitted by law.

Respectfully submitted,

*/s/ Jessica Kerr, Esq.*
_____
FBN: 92810
**JESSICA L. KERR, P.A**.
*Co-Counsel for Plaintiff*
Ft. Lauderdale, Florida 33301
Telephone (561) 667-3854
Email: jessicakerresquire@gmail.com
Email 2: appeallawfirm@gmail.com

*/s/ Marc E. Dann*
_____
Marc E. Dann, Esq.
Bar No. 111463
**THE DANN LAW FIRM CO., LPA**
PO Box 6031040
Cleveland, Ohio 44103
Telephone: 216-373-0539
Email: notices@dannlaw.com
*Co-Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that  a true and correct copy of the foregoing was served CM-ECF filing upon the following counsel of record on October 16, 2015; ARIEL ACEVEDO, Esq. aa@lgplaw.com, **LIEBLER, GONZALEZ & PORTUONDO**, Courthouse Tower – 25th Floor, 44 West Flagler Street, Miami, FL 33130.

<em>/s/ Jessica L. Kerr, Esq.</em>